**CUTTING et al. v. BRYAN et al.**

Circuit Court of Appeals, Ninth Circuit. February 4, 1929.

Rehearing Denied March 18, 1929.

No. 5583.

Dunne, Dunne & Cook, Peter F. Dunne, J. E. Cook, Arthur B. Dunne, and Louis Bartlett, all of San Francisco, Cal., for appellant Cutting.

Alan H. Critcher, of San Francisco, Cal., for appellant Buzzard Hill Mine, Inc.

Bert Schlesinger, Walter Loewy, and A. B. Weiler, all of San Francisco, Cal., for appellee Bryan.

John L. McNab, of San Francisco, Cal., for appellee Mulford.

Before GILBERT and DIETRICH, Circuit Judges, and NORCROSS, District Judge.

DIETRICH, Circuit Judge. In the spring of 1924 the appellee Bryan and one Merriam resided at Mt. Kisco, in the state of New York, appellant Cutting in California, and defendant Mulford in Pennsylvania. Bryan and Mulford were associated together in the leather business in Philadelphia. Merriam and Cutting are cousins, both admitted to the bar, and at the times mentioned the former was engaged in the real estate business and the practice of law at Mt. Kisco, and the latter in the promotion of mining enterprises in California. Through Merriam, Bryan became interested in mining properties in California, known as the Buzzard Hill group and controlled by Cutting, and in all subsequent dealings in respect thereto, and other properties, such interests and obligations as appear to be those of Bryan were and were known to be the interests and obligations of both Bryan and Mulford jointly. After some negotiations a written memorandum was signed, April 18, 1924, by Merriam, Cutting, and Bryan, in which it was agreed that Cutting and Merriam were "to incorporate the Buzzard Hill Mine" for 1,000,000 shares, of which 600,000 were to be issued to them and 400,000 placed in the treasury, and upon certain conditions, not material to explain, Bryan was to take 100,000 shares of the treasury stock at 25 cents per share. Shortly thereafter the Buzzard Hill Mine, Inc., was incorporated under the laws of Delaware, with Cutting, Merriam, and Bryan the directors thereof. Cutting and Merriam became respectively president and secretary, and no change of either directors or officers was ever made. Bryan paid in the full amount of $25,000, and received the 100,000 shares subscribed for.

It having soon become apparent that the Buzzard Hill properties would probably not justify further development, toward the latter part of June, 1924, at Cutting's suggestion that they investigate another group, called the Outlook, Bryan advanced to him, as president of the company, an additional sum of $5,000, to be used for that purpose. Before this fund was exhausted, Cutting took an option upon other claims, referred to as the Independence group, and after consideration it was decided to suspend activities on the Outlook group and to devote the residue of the $5,000, then supposed to be $2,500, but actually only about $1,700, to an investigation of the Independence. In a sense the written memorandum entered into at this juncture forms the basis of this suit. Bearing date July 31, 1924, and the signatures of Cutting, Merriam, and Bryan, it provided:

"Cutting has been authorized to transfer $2,500 of the Outlook account for purposes of investigation and development of the Independence Mine owned by the Zachary boys, six miles below Happy Camp, and it is understood that, should the Independence Mine prove to be valuable enough for further development so that additional work should be done thereon, and ultimately net returns obtained therefrom, in such an event, after meeting the requirements of the owners as set forth in their agreement with Cutting dated June 25, 1924, out of the next proceeds Cutting is to return to Messrs. Bryan, Mulford and associates their investment of $2,500 and immediately assign to the Buzzard Hill Mine, Inc., all his right, title and interest of, in and to said Independence Mine, by virtue of any option, contract or deed, so that the stockholders of the said Buzzard Hill Mine shall be the beneficiaries of any profits which may arise from the Independence Mine."

In substance it further recited that Bryan and Merriam had no further obligation to furnish finances for the development of the Outlook property; that Merriam was liable

to Bryan for one-half the money expended thereon; that Merriam was to have no financial responsibility touching the Independence, and that Bryan and Mulford assumed no responsibility to furnish finances for the Independence, other than the Outlook balance, then supposed to be $2,500. Thereupon development work was prosecuted under the direction of Cutting upon the Independence group, in the course of which gold of the value of more than $100,000 was taken out, and, notwithstanding the limitation contained in the agreement, Bryan, at Cutting's request, advanced to him substantial amounts, the aggregate of which is one of the questions in controversy. It soon became apparent that the property was probably of great value and would yield a large net return. Accordingly Cutting, in compliance with the option agreement, paid the owners the $45,000, stipulated as the purchase price, and took conveyances in his own name. Subsequently he declined to respond to Bryan's demands that the title be conveyed to the Buzzard Hill Company, and took the position that Bryan had no interest; hence this suit.

Alleging that Cutting controls Merriam, and that the two are in control of the company, Bryan prayed for a decree adjudging that he, Mulford, and the Buzzard Hill Mine, Inc., are the beneficial owners of the property; that Cutting holds the title in trust for them; that the rights of the respective parties be determined; and further that Cutting be required to make appropriate conveyances to the beneficial owners. There are further prayers for an accounting, injunction, and receiver, and for general relief. The court below issued an injunction pendente lite and after a trial upon the merits entered an interlocutory decree, adjudging that Cutting holds the properties in trust for the company, directing him to make conveyances thereof and to satisfy liens thereon incurred by him, making permanent the injunction, ordering reference to a master to take an accounting, and appointing a receiver to take charge of the properties pending further proceedings. From this decree this appeal is prosecuted by Cutting and the company.

Appellants press upon our consideration two general contentions: (1) That the record fails to show any beneficial interest in Bryan or the corporation, or that in any respect Cutting is other than absolute owner of the property; and (2) that, it appearing from the complaint itself that the Buzzard Hill Company, a foreign corporation, has failed to comply with the statutes of California relating to foreign corporations doing business in that state, whatever might otherwise be his rights, no relief is available to the plaintiff.

■■ The argument upon the first point in brief is that Cutting's obligation to convey was conditional, and there is no sufficient showing that the conditions ever arose. The option held by Cutting from the owners of the Independence group provided for the manner in which the claims were to be worked, and required that out of the proceeds or otherwise $20,000 should be paid on or before December 31, 1924, and the other $25,000 of the purchase price on or before June 30, 1925. These payments, it is conceded, were seasonably made, and, as already stated, Cutting thereupon took absolute conveyances to himself of the properties. As to what occurred during this period and shortly thereafter, the source of the funds coming into Cutting's hands for operating the property and making payment of the purchase price, the amount of ore or gold taken out and the handling of it, the mode of keeping accounts, and other matters the record is voluminous. But, without undertaking the almost impossible task of stating a comprehensive analysis of it within the reasonable compass of an opinion, we think we may arrive at a fair conclusion largely from the writings of Cutting alone before he conceived the purpose of denying Bryan's interest, or, if not that, before such purpose was brought into the open. The practical construction against interest of a contract by a party thereto may constitute the strongest evidence of its intent, and acceptance of acts of performance may operate as a waiver of strict or complete compliance. With these considerations in mind, we may refer to a few of Cutting's letters.

■ That at the outset he desired the Independence enterprise to be undertaken on behalf of himself and the other stockholders of the company appears from a letter to Bryan the day before he took the option, wherein, after describing the status of the property and noting the probability of procuring the option he wrote: "The work [to which he had specifically referred] will cost about $2,-500, so I have written Joe (Merriam) that, if some of you folks back there want to bet $2,500 that the shoot will extend down, we will take up the option and find out." In a letter of February 16, 1925, referred to at this place because of its historical recitals, Cutting states that he suggested the money which he had saved from the Outlook operation be spent on developing the Independ-

ence, and, that having been agreed upon, "before the work was fairly started the agreement of July 31st arrived, which made the Independence an asset of the Buzzard Hill." And again: "Although the Independence was an asset of the Buzzard Hill, through no fault of mine and against my judgment and personal interests, but to accommodate and please others it had been so arranged. It was perfectly logical and right that Buzzard Hill funds should be used for the Independence for any necessary purpose, and you had consented to such use." On August 13, 1924, he advised Bryan of the progress of the work, and stated that the state mineralogist had looked the property over and thought there was good chance of developing a valuable property.

As early as September 23, 1924, he wrote Mulford that he was hopeful of taking out the whole price of the mine before the payments became due, adding: "I think Mr. Bryan is rather pleased with things as they are, and I think we are to be congratulated in getting hold of the Independence on as good terms as we have." On December 10, 1924, he wrote Bryan, stating, among other things: "I feel quite sure of having enough money to pay the balance of that payment [the first payment of $20,000] without working the $6,000 worth of specimens which I have in San Francisco. * * * I can handle that situation, for I have a little money myself, and I can use part of the Buzzard Hill funds for the purpose of payment, if necessary, and then pay that back." And to Mulford the same day: "We have made a very satisfactory strike at the Independence Mine; in fact, we have more high grade ore than our little mill can handle. I have the sacks of it sealed up and stowed away under my bed. * * * I hope before the 1st of April to make the full payment on the property and have all the money back that we have expended on it. If my hopes are realized, I feel that we should be very well pleased with our entire investment, both at Buzzard Hill and here." On December 15, 1924, to Bryan: "In the chest that Fluegler is sitting on as he takes this dictation, I have about $14,000 worth of specimens, and at least $2,500 worth of amalgam and $4,568 worth of bullion that we have retorted. That will more than take care of the first payment, and I have no doubt but that, if I wanted to, I could take out all the rest of the purchase price of the property before the first of the year. But I could not handle it, so I am going to slow down operations here pretty quick."

Two days later he wired Bryan that he estimated the whole amount taken out to date to be about $45,000, and that he had enough in sight to cover expenses so far. This was in substantial conformity with an itemized statement contained in his letter of December 16th to Bryan, which he summed up in the statement: "I figure that I have the full price of the mine out now as follows: [Here follows an itemized statement.] Besides this, I believe I have enough in sight in the mine to more than return every cent we have spent on the mine to date." In a letter to Merriam, dated February 1, 1925, after referring to "a little argument about the division of Independence" between Merriam and Bryan, he says: "I just read over the agreement which we all signed last July regarding the Independence, and from what I can see it definitely settled the matter by making the Independence an asset of the Buzzard Hill. Since it has been made an asset of the Buzzard Hill, and Buzzard Hill funds have been used in developing it, I don't see where there is any argument left." In a letter to Bryan, dated February 14, 1925, among other things he states: "You understand, Colonel, I promise nothing except that I will make the money go as far as possible, and I will do my best to dig up a real mine for us. Yes; I will promise to keep accounts better than I did, and render you an itemized statement every month."

On July 2, 1925, two days after completing payment of the purchase price and taking the deeds, he wrote Bryan: "The deeds for the Independence property were taken from escrow by me on my way to Yreka, and are now with the county recorder being recorded. When I receive the deeds from the recorder, so as to get the exact description of the claims, I will deed the five quartz claims and the two other quartz claims which I had located for me to the Buzzard Hill Corporation, making in all seven claims. The protection placer claim is not to be deeded, but is to remain my sole property, and is to be used as a camp site for the benefit of the company so long as we operate the property." True, he added the following as a postscript: "It is understood that the deeding of these claims is subject to the indebtedness due me, as shown on the books of Buzzard Hill Mine, Inc." But this declaration does not qualify his admission as to the beneficial ownership of the claims. If in fact he advanced money for operation in excess of his obligation, it may well be that he has an equitable lien or charge which should be taken care of upon an accounting. On Au-

gust 12, 1925, he wrote Bryan: "I am just as hopeful of the Independence as you are, Colonel. It has the earmarks of a big mine; that is, a big producer of money. I don't think it will ever be what is called a big mine, for it will not be a big tonnage property, but it does look as though it would return us a lot of money."

We have no doubt that, subject to possible charges to be adjusted and provided for upon an accounting, Cutting holds the title to the property in trust for the ultimate benefit of the stockholders of the Buzzard Hill Mine, Inc.

▮ Passing to the second contention: The Corporation License Act of California (St. 1923, P. 1034) requires that a foreign corporation doing intrastate business in the state shall file in certain designated offices copies of its articles of incorporation and an affidavit stating the amount of its authorized capital stock, and pay a filing fee of $75—now increased to $100. For default the corporation is subject to a fine of not less than $500 and, as the statute reads, "in addition to the penalty herein provided, every contract made by or on behalf of any such foreign corporation, affecting the personal liability thereof or relating to property within the state, shall be held void on its behalf and on behalf of its assigns, but shall be enforceable against it or them."

Recognizing the fact that the contract of July 31, 1924, was not made by the Buzzard Hill Company, or by any one authorized to bind it to any obligation thereunder, counsel for appellants thus state their position: "But so far as the Independence property is concerned it was a contract made for the benefit of the Buzzard Hill Mine, Inc., as a third person. As the Supreme Court of California has held (probably More v. Hutchinson, 187 Cal. 624, 203 P. 97), this contract, until accepted and adopted by the Buzzard Hill Corporation, is assignable to the legal category of a mere offer, and the bringing of this suit by the Buzzard Hill was the acceptance of and the adoption of that offer by the Buzzard Hill, for that corporation is the essential plaintiff in this case, and it is only in right of that corporation that Bryan has any standing as a plaintiff and that the contract is enforceable at all in this stockholders' representative suit."

▮ We need not stop to consider the precise status of a corporation, when named as defendant in a suit brought by a stockholder who himself has no contractual rights, but seeks simply to enforce rights of and on behalf of the corporation. See Cutting v. Woodward [C. C. A.] 255 F. 633–635, and Southern Pacific v. Bogert, 250 U. S. 483, 39 S. Ct. 533, 63 L. Ed. 1099. As was true in Cutting v. Woodward, the corporation, presumably acting under the direction of Cutting, from the beginning took and persistently maintains a position hostile to the plaintiff. By its answer it denied the material allegations of the complaint, and it now joins with Cutting in his brief upon this appeal. Under such circumstances it would be a strange doctrine to hold that the bringing of the suit was its act. Neither as a party to the contract nor as a stockholder did Bryan have the power, either directly or by bringing the suit, to bind the corporation to an acceptance, and, if we are to take appellants' view, the corporation was legally incompetent effectively to accept, because of its failure to comply with the state statutes.

Nor is the plaintiff's right to maintain the suit at all dependent upon the exercise by the corporation of its option to accept a conveyance of the Independence properties. The contract was signed, not by the corporation, but by three individuals, and, as one of the signatories, he had the right to maintain a suit to compel the performance by Cutting, another signatory, of his obligation thereunder. Manifestly the suit is not exclusively or essentially a stockholders' suit; it rests upon a contract made directly between the parties. The provision for conveyance to the corporation is not of its essence. That was doubtless inserted as furnishing a measure of the substantive rights of the parties to the agreement, and as a convenient mode of procedure in handling and protecting such rights. But surely it was not contemplated that the rights of the other signatories might be defeated, and that Cutting might appropriate to himself the entire property in case the corporation should not accept.

In reality the parties to the contract were the ultimate and real beneficiaries, for they constituted all the stockholders, and the provision of the contract is that the assignment or conveyance be made to the corporation, "so that the stockholders of the said Buzzard Hill Mine shall be the beneficiaries of any profit which may arise from the Independence mines." In a sense the corporation was to take title to the property in trust for the signatories of the contract, who were its stockholders, and a trust will not fail for want of a trustee. Nor can Cutting defeat the substantive interest of Bryan by declining to exercise the power he has as a director and the president of the company to see to it that it qualifies to act by complying with

the state statutes and thereupon accepts conveyance of the property. That Bryan would co-operate in bringing about this end is manifest, and that the two co-operating could accomplish it is equally manifest. This duty, implied by his contract and called for by every consideration of good faith, the court has the power to require him to perform, and even were the incompetency and unwillingness of the contemplated grantee in no wise chargeable to him, it would appoint a trustee to hold the title for those for whose benefit it was procured.

■ It is true that state statutes relating to foreign corporations must be respected, and in view of the fact that the corporation has not complied therewith and of the possibility that there may be claims against the property which by contract or in equity should be held to be superior to the rights of Bryan, Cutting, and Merriam under their original contract, and of the corporation and its stockholders, assuming a competent acceptance by it, we are of the opinion that it was premature to order present conveyance from Cutting to the company, and that the following proceedings should be taken:

If a receiver has not already been appointed as provided for in the interlocutory decree, let the appointment be made. Upon the qualification of such receiver, Cutting should be required to convey title to and give possession of the property to him, instead of to the company, as the decree now provides. Within the discretion of the court below, either Cutting and plaintiff, co-operating, should be required to take the necessary steps to have the corporation qualify under the California laws, or the receiver may be directed to do what is requisite in its name and on its behalf. The court is then to proceed, as in a case where a fund or other property is in the possession of the court, to determine all rights and claims to and upon the property, and their relative dignity, and to that end by appropriate means notice, constructive or otherwise, should be given requiring, within a time specified, all claimants of liens or charges upon the property, or of any interest therein, including stockholders of the corporation, to present their claims for adjudication, on penalty of being barred in case of default. Such determination shall include the accounting provided for in the interlocutory decree.

What disposition shall ultimately be made of the title will in a measure depend upon such accounting and determination. Should the exigencies require, we recognize the power of the court to order a sale of the property free from liens, and a distribution of the proceeds. Or it may be distributed in several undivided interests to the ultimate beneficial owners, as such interests may be made to appear, or if the corporation becomes qualified, and is willing to accept, conveyance may be made to it. In any event, subject to such modifications, if any, as may have subsequently been agreed upon by the parties to the contract, or as may have resulted by operation of law from the facts and the conduct of the parties, the stockholding standard or measure of interests provided for in the contract shall prevail in the ultimate disposition of the property or the proceeds thereof.

The cause is remanded for the entering of a modified interlocutory decree and for further proceedings not out of harmony herewith; each party to bear his own costs on this appeal.